UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,
                                Case No. 18-cr-20599
                                Hon. Matthew F. Leitman

v.

DEANGELO MONTEZ TALTON,

     Defendant

_____/

## OPINION AND ORDER DENYING DEFENDANT'S
## MOTION TO SUPPRESS (ECF No. 9)

On August 6, 2018, two private security guards stopped Defendant Deangelo
Talton, seized a firearm from him, and turned the firearm over to police. Talton is
now charged with being a felon in possession of a firearm. (*See* Indictment, ECF No.
1.) Talton has moved to suppress the firearm on the ground that the guards seized it
in violation of the Fourth Amendment. (*See* Mot. to Suppress, ECF No. 9.) Because
the Fourth Amendment does not apply to the seizure by the private security guards,
Talton's motion is **DENIED**.

## I.    FINDINGS OF FACT

The Court held an evidentiary hearing on Talton's motion to suppress. Based
upon the testimony and other evidence presented at the hearing, the Court makes the
following findings of fact:

1.      Evergreen Regency Townhomes ("Evergreen") is an apartment complex in Flint, Michigan with more than 300 units. (*See* Mot. to Suppress H'rg Tr. at 21, ECF No. 19, PageID.126.[1])

2.      Evergreen is a "high crime area." (*Id.* at 28:19–25, PageID.133.)  The common offenses at Evergreen involve drugs, guns, prostitution, and gang activity. (*See id.* at 28:19–30:1, PageID.133–35.)

3.      Hi-Tech Protection ("Hi-Tech") is a private security guard agency. (*See* License, ECF No. 15-3.)  It is owned by Timothy Johnson. (*See* Mot. to Suppress Hr'g Tr. at 161:11–12, ECF No. 19, PageID.266.)

4.      Hi-Tech operates under a Security Guard Agency License (the "License") issued by Michigan's Corporations, Securities and Commercial Licensing Bureau (the "Bureau") – an entity within Michigan's Department of Licensing and Regulatory Affairs. (*See* License, ECF No. 15-3.)  The License is issued in the name of Hi-Tech and Johnson. (*See id.*)  The Bureau issued the License to Hi-Tech and Johnson pursuant to Michigan's Private Security Business and Security Alarm Act, Mich. Comp. Laws §§ 338.1051, *et seq.*

---

[1] While the Court has provided citations to certain portions of the evidentiary hearing transcript following some of the findings made above, the Court does not mean to imply that the cited evidence is the sole evidence supporting each finding.  The Court has made the findings based upon the totality of the evidence presented by both parties at the hearing.

5.      Hi-Tech's security guards are organized in quasi-military ranks, similar to a police department. (*See* Mot. to Suppress Hr'g Tr. at 60:7–11, ECF No. 19, PageID.165.)

6.      In August 2006, Evergreen entered into a contract with Hi-Tech (the "Contract"). (*See* Contract, ECF No. 15-4.)  At that time, Johnson was a sergeant with the Flint Police Department. (*See id.* at PageID.96.)

7.      The Contract called for Hi-Tech to provide "patrolling and law enforcement services" for Evergreen. (*See id.*)  For purposes of Talton's motion to suppress, the relevant provisions of the Contract are as follows:

- "Patrol officers to be armed and in uniform at all times." (*Id.* ¶ 1.)

- "Carried equipment to include all such devices and tools customary of a law enforcement officer (i.e. sidearm, handcuffs, radio, etc.)." (*Id.*)

- "All officers will carry one or more communication devices to ensure direct communication with site management and outside law enforcement agencies (i.e. local fire and police, emergency medical service, etc.)." (*Id.*)

- "Patrol officers to provide crime prevention services to management and tenants alike; make arrests of criminals caught committing crimes on property; respond to emergency situations and dispatch emergency services as needed; and be available to provide testimony against residents for criminal offenses or disturbances relevant in the course of related eviction proceedings.  Patrol officers to be proactive in [] enforcement of narcotics and trespassing." (*Id.* ¶ 4.)

- Johnson "will serve as the primary contact and security coordinator with [Evergreen] and will be personally active in patrols (minimum of 5 hours per week), timely incident responses and follow-up investigations, and other required actions of this contract." (*Id.* ¶ 3.)

- "A fee of $1,400.00 per month will be paid to cover [Hi-Tech's] expenses associated with <u>Sgt. Johnson's personal involvement</u> in patrols of the property and attendance at the weekly meeting, performing resident background screening checks, confirmation of [Evergreen's] '911' call volumes, and other similar special projects. Fee subject to cancellation should [Evergreen] feel[] Johnson is not personally involved in performing the above additional duties." (*Id.* ¶ 10(c), PageID.98; emphasis in original.)

8.    Pursuant to the Contract, Hi-Tech has been providing security services to Evergreen since August 28, 2006. (*See id.* at PageID.96.)  Hi-Tech was providing such services on August 6, 2018.  By that time, Johnson had become the chief of the Flint Police Department. (*See* Mot. to Suppress Hr'g Tr. at 161:13–14, ECF No. 19, PageID.266.)

9.    While on duty at Evergreen, Hi-Tech security guards do not have the ability to run a Law Enforcement Information Network (LEIN) check on suspects, are not allowed to place suspects in their vehicle for transport to a police facility, are not permitted to write tickets for civil infractions, and cannot bring criminal charges against suspects. (*See id.* at 31, PageID.136.)

10.     When Hi-Tech security guards encounter a suspect in possession of a weapon or contraband, their general procedure is to confiscate the item, detain the suspect, and call the Flint Police Department to come to Evergreen to take custody of the suspect. (*See id.* at 31–33, PageID.136–39.)

11.     Hi-Tech's guards contact the Flint Police Department by calling 911 on their personal cell phones. (*See id.* at 32:1–6, 63:1–5, PageID.137, 168.)  The guards do not have a seven-digit direct-access telephone number for any person or unit at the Flint Police Department. (*See id.* at 32:7–9, PageID.137.)  And the two-way radios carried by Hi-Tech security guards do not connect to the Flint Police Department. (*See id.* at 62:10–16, PageID.167.)  At times, law enforcement officers from the Genesee County Sheriff's Department and/or the Michigan State Police will respond to 911 calls placed by Hi-Tech security guards. (*See id.* at 32:13–20, PageID.137.)

12.     Once Hi-Tech security guards turn a suspect over to the police, the matter is out of their hands. (*See id.* at 33:17–19, PageID.138.)  Hi-Tech's guards do not make decisions about whether to seek charges and/or prosecute a suspect. (*See id.* at 120:6–9, 139:16–22, PageID.225, 244.)

13.     Edward Smith and DeShawn Perry are private security guards employed by Hi-Tech. (*See id.* at 8:21, 103:13, ECF No. 19, PageID.113, 208.)  On

August 6, 2018, Smith was a lieutenant with Hi-Tech. (*See id.* at 11:25, PageID.116.) Perry held the rank of sergeant. (*See id.* at 136:10–12, PageID.241.)

14. Neither Smith nor Perry holds any type of security services license. (*See id.* at 93:1–7, PageID.198.) Instead, both work under the Security Guard Agency License that was issued to Hi-Tech and Johnson. (*See id.* at 58:5–7, PageID.163.)

15. Both Smith and Perry are licensed to carry a concealed firearm. (*See id.* at 10:17–11:12, 106:7–12; PageID.115–16, 211.)

16. On August 6, 2018, Smith and Perry were patrolling Evergreen. (*See id.* at 140:9–11, PageID.245.) Both guards were in their Hi-Tech uniforms: company-issued black pants and shirts with patches that identified them as security guards. (*See id.* at 10:4–5, 61:22–23, PageID.115, 166.) Both guards wore a duty belt that contained their privately-owned firearms, pepper spray, and handcuffs. (*See id.* at 9:24, 105:13, PageID.114, 210.) The guards also carried a two-way radio, which was supplied by Hi-Tech. (*See id.* at 10:10–13, 62:10–11, PageID.115, 167.)

17. On the afternoon of August 6th, Smith and Perry were drawn toward an argument that Talton appeared to be having with another man. (*See id.* at 37:18–40:3, PageID.142–45.) The guards recognized Talton, who was not an Evergreen resident, because Talton's "girlfriend had an apartment out there," and Talton hung "out on the property." (*Id.* at 34:5–6, PageID.139.)

18.    Smith and Perry heard the other man tell Talton, "Go put that motherfucker down," and, "You might as well kill me.  You should have blew me." (*Id.* at 40:3, 123:19–20, PageID.142, 228.)  Talton then walked quickly toward the Evergreen front gate. (*See id.* at 40:9–10, 40: 25, PageID.142.)  The officers saw Talton holding his pockets in a manner that suggested to them that "he had something in them." (*Id.* at 125:12–13, PageID.230; *see also* 41:20–21, 80:11–12, PageID.146, 185.)  Based on these observations, Smith concluded that Talton might have a gun. (*See id.* at 40:7, PageID.142.)

19.    Smith and Perry followed Talton as Talton passed by one of the apartment buildings within Evergreen. (*See id.* at 42:19–20, PageID.147.)  The two guards separated when Smith "told Perry to go around one side of [the] building and I will go around the other side of the building." (*Id.* at 43:1–3, PageID.148.)  Smith then encountered Talton and saw the butt end of a 30-round magazine "sticking out [of Talton's] pocket." (*Id.* at 43:17, PageID.148.)  Smith says he also saw a bulge in Talton's other pocket.[2] (*See id.* at 44:11, PageID.149.)

---

[2] Talton contests the guards' version of events.  According to Talton, two other men – who he identifies as Casey and 4G – were arguing.  Talton says that he interceded in the argument once 4G pulled a gun on Casey.  Talton then took the firearm and walked away so that he could return the gun to 4G outside of Evergreen's property (and away from the Hi-Tech security guards). (*See* Mot. to Suppress Hr'g Tr. at 188–93, ECF No. 19, PageID.293–98.)  Talton also says that he did not position his hands near his pockets in a suspicious manner and that neither the gun nor the ammunition could be seen in his pockets. (*See id.* at 194, 198, PageID.299, 303.)  Given the Court's decision that the Fourth Amendment does not apply to the guards' actions

20.     Smith drew his firearm, pointed it at Talton, and told Talton to stay still and put his hands up. (*Id.* at 45:16–19, 86:23–87:5, PageID.150, 191–92.)  Talton complied. (*See id.* at 20–21, 87:6–7, PageID.150, 192.)  Perry then turned a corner, came upon Smith pointing his firearm at Talton, and drew his own weapon. (*See id.* at 128:1–6, PageID.233.)

21.     Smith and Perry grabbed Talton's arms, holstered their weapons, and conducted a pat-down search of Talton. (*See id.* at 46:2–15, PageID.151.)  Perry found a loaded firearm in one of Talton's pockets. (*See id.* at 129:6–11, 129:23–24, PageID.234.)  Smith found a thirty-round magazine in another of Talton's pockets.[3] (*See id.* at 46:17–21, PageID.151.)

22.     After the guards found the gun and the magazine, Smith handcuffed Talton and walked Talton toward the Hi-Tech guard shack. (*See id.* at 48:11–12, 130:6–14, PageID.153, 235.)  At the same time, Perry secured the firearm and the magazine and locked these items in the Hi-Tech guard shack. (*See id.* at 48:11–12, 130:6–14, PageID.153, 235.)

---

here, the Court does not need to resolve – and does not resolve – these factual disputes bearing on the basis for the guards' stop of Talton.

[3] Perry's report, written hours after the incident, suggested that the guards found the firearm and the magazine in the same pocket.  At the evidentiary hearing, however, Perry clarified that the guards found the firearm and the magazine in different pockets on Talton.  (*See* Mot. to Suppress Hr'g Tr. at 131, ECF No. 19, PageID.236.)

23.     Smith then observed about fifty to eighty people watching a fight break out between two men. (*See id.* at 49:6–24, PageID.154.)  Smith went to control the crowd, leaving Talton with Perry. (*See id.* at 49:6–8, PageID.154.)

24.     As Perry stood with Talton, Perry used his personal cell phone to call 911 and ask the Flint police to come to Evergreen to deal with Talton. (*See id.* at 132:24–134:10, PageID.237–39.)

25.     After Perry called 911, he became concerned about the fight that Smith was attempting to break up.  Perry then left Talton alone by the Hi-Tech guard shack and went to help Smith control the fight. (*See id.* at 50:5–9, PageID.155.)

26.     While Smith and Perry were addressing the fight, Talton left the guard shack.  Smith and Perry discovered that Talton had fled once they returned to the shack after dealing with the fight. (*See id.* at 50:11–15, PageID.155.)

27.     The Flint police eventually arrived at Evergreen.  At that point, Smith and Perry gave the officers the gun they had seized from Talton, and they also provided the officers with a physical description of Talton. (*See id.* at 50:23–51:4, PageID.155–56.)  Smith, Perry, and the police officers then searched the Evergreen complex for Talton. (*See id.* at 51:9–10, PageID.156.)  The search was unsuccessful.

28.     Smith learned of Talton's whereabouts later that night, and he called the Flint police so that officers could come and arrest Talton. (*See* 92:2–11,

PageID.197.)  The police returned to Evergreen and, with Smith and Perry's help, arrested Talton. (*See id.*)

## II.   LEGAL ANALYSIS

Talton moves to suppress the firearm that Smith and Perry found in his pocket. (*See* Mot. to Suppress, ECF No. 9, PageID.36.)  Talton argues that Smith and Perry violated the Fourth Amendment when they stopped him, searched him, and seized the firearm.[4] (*See id.*)

In resolving Talton's motion, the Court must first determine whether the Fourth Amendment applies to the conduct of Smith and Perry.  That Amendment "proscribes only governmental action and does not apply to a search or seizure, even an unreasonable one, conducted by a private individual not acting as an agent of the government or with the participation or knowledge of any governmental official." *United States v. Lambert*, 771 F.2d 83, 89 (6th Cir. 1985).  Talton bears the burden to demonstrate that Smith and Perry's search and seizure was "governmental action" rather than conduct by "private individual[s]." *Id.*; *see also United States v. Freeland*, 562 F.2d 383, 385 (6th Cir. 1977); *United States v. Day*, 591 F.3d 679, 683 (4th Cir. 2010).  He has not carried that burden.

---

[4] Because the Court holds that Smith and Perry were not state actors, and therefore the Fourth Amendment does not apply to their search and seizure of Talton, the Court declines to reach whether Smith and Perry's actions were supported by reasonable suspicion and/or probable cause.

**A**

Talton first argues that the conduct by Smith and Perry was governmental action because Smith and Perry acted as agents of the Flint police. (Def.'s Supp. Br., ECF No. 22, PageID.347–49.)   The Court respectfully disagrees.

A private actor who conducts a search or seizure may be deemed an agent of the police only where two circumstances are present: "First, the police must have instigated, encouraged or participated in the [individual's] search.   Second, the individual must have engaged in the search with the intent of assisting the police in their investigative efforts." *Lambert*, 771 F.2d at 89; *see also United States v. Hardin*, 539 F.3d 404, 418 (6th Cir. 2008) ("The critical factors are: (1) the government's knowledge or acquiescence, and (2) the intent of the party performing the search." (quotations omitted)).

Talton has not shown that either circumstance existed in connection with the stop and seizure by Smith and Perry.  Talton has not identified any evidence that the Flint police knew about or encouraged the stop and search of Talton.  Indeed, Talton has not pointed to any proof that Smith and Perry communicated about him (and/or coordinated) with the Flint Police Department prior to initiating the stop and conducting the search.  Nor has Talton demonstrated that Smith and Perry intended to "assist[] police in their investigative efforts" when they stopped and searched Talton.  In fact, there were no "investigative efforts" by police at the time Smith and

Perry stopped Talton.  And Talton has not persuaded the Court that when the guards stopped him, they were focused on assisting the police in the enforcement of the criminal laws of the State of Michigan.  For all of these reasons, Talton has not demonstrated that Smith and Perry were agents of the Flint Police Department when they stopped and searched Talton.

Talton counters that the Flint Police Department knew about and acquiesced in Hi-Tech's actions because "[t]he Flint police were clearly aware that the guards were arresting people and seizing evidence." (Def.'s Supp. Br., ECF No. 22, PageID.347.)  But Talton has not cited any authority for the proposition that a police department's general understanding that security guards may be making arrests and conducting searches rises to the level of acquiescence or knowledge sufficient to make the guards agents of the police under the *Lambert* line of cases.

Talton also highlights that the owner of Hi-Tech, Timothy Johnson, was the Chief of Police in Flint at the time of the stop and seizure and was required under the Contract to personally participate in at least some security patrols at Evergreen. (*See id.* at PageID.347–48.)  But on this record, the Court cannot conclude that Johnson was providing services to Evergreen in his official capacity.  Nor can the Court conclude that Johnson ever used his official capacity to share information between the Flint police and Hi-Tech guards or to coordinate the activities of the Flint police and Hi-Tech guards.  Simply put, Talton has not presented sufficient

evidence to establish that Johnson's dual role as Chief of Police and owner of Hi-Tech converted the conduct by Smith and Perry into governmental action.

Furthermore, the case that Talton cites in support of his argument, *Hardin*, 539 F.3d 404, is distinguishable.  In *Hardin*, the Sixth Circuit held that an apartment manager acted as a government agent when the manager – at the behest of the police – entered an apartment, identified the defendant, and told the police that the defendant was in the apartment. *See* 539 F.3d at 417.  According to the court, "because the officers urged the apartment manager to investigate and enter the apartment, and the manager, independent of his interaction with the officers, had no reason or duty to enter the apartment, we hold that the manager was acting as an agent of the government." *Id.* at 420.  Here, unlike in *Hardin*, Smith and Perry did not stop and search Talton at the behest or urging of the police.

The facts of this case are closer to those in *Lambert*, *supra*, in which the Sixth Circuit held that a housekeeper was not an agent of law enforcement.  In *Lambert*, a defendant's housekeeper brought evidence of the defendant's drug use and transactions to the FBI. 771 F.2d at 86.  Although the FBI paid for some of the housekeeper's expenses, the FBI agents "never instructed or encouraged [the defendant's private housekeeper] to take items from [the defendant's] home." *Id.* at 86, 89.  The defendant argued that the evidence should have been suppressed because the housekeeper acted as an agent for the FBI. *Id.* at 89.  The Sixth Circuit rejected

that argument. The court reasoned that the evidence should not be suppressed "simply because [the housekeeper] brought the seized items to the FBI." *Id.* Rather, the housekepeer's search was "a private search and, therefore, not within the purview of the Fourth Amendment" because the FBI did not "instigate[], encourage[], or participate[] in her searches." *Id.*

Here, as in *Lambert*, the lack of police encouragement demonstrates that Smith and Perry's search was a private search that was not subject to the Fourth Amendment. Smith and Perry therefore were not acting as agents of the Flint Police Department such that the evidence they recovered should be suppressed.

**B**

Alternatively, Talton argues that Smith and Perry were governmental actors under the "public function" or the "nexus" tests, which courts use to determine if an individual was acting "under color of state law" for § 1983 purposes. *See Romanski v. Detroit Entm't, L.L.C.*, 428 F.3d 629, 636 (6th Cir. 2005). Again, the Court respectfully disagrees.

**1**

Talton has failed to prove that Smith and Perry were state actors under the public function test because he has not presented evidence that the guards were performing a function that is traditionally reserved to the state.

"Under the public function test, a private entity is said to be performing a public function if it is exercising powers traditionally reserved to the state, such as holding elections, taking private property under the eminent domain power, or operating a company-owned town." *Id.* With respect to whether a private security guard qualifies as a governmental actor under the public function test, "a line . . . has been drawn in the case law. The line divides cases in which a [security guard] exercises a power traditionally reserved to the state, but not exclusively reserved to it, e.g., the common law shopkeeper's privilege, from cases in which a [security guard] exercises a power exclusively reserved to the state, e.g., the police power." *Id.* at 637. "Where private security guards are endowed by law with plenary police powers such that they are de facto police officers, they may qualify as state actors under the public function test." *Id.* But, in cases where "the private [guards] have some police-like powers but not plenary police authority," including "cases in which a private institution's security employees have been dispatched to protect the institution's interests or enforce its policies," the guards likely will not be state actors. *Id.* at 637–38.

Talton argues that Smith and Perrry were performing a public function because state law authorized them to arrest Talton for committing a felony in their

presence.[5] (Def.'s Supp. Br., ECF No. 22, PageID.350.) The state law to which

Talton refers is Mich. Comp. Laws § 764.16(a),[6] the Michigan statute that authorizes

*every* citizen to make an arrest for a felony committed in his presence.[7] (*Id.* at

---

[5] Carrying a concealed weapon without a license is a felony under Michigan law. *See* Mich. Comp. Laws § 750.227.

[6] The statute provides, in part: "A private person may make an arrest . . . for a felony committed in the private person's presence." Mich. Comp. Laws § 764.16.

[7] Talton's argument relies in part on *People v. Eastway*, 241 N.W.2d 249 (Mich. Ct. App. 1976). (*See* Def.'s Supp. Br., ECF No. 22, PageID.251–52.) In *Eastway*, the Michigan Court of Appeals suggested that any private security guard may be subject to the Fourth Amendment:

> We are inclined to agree with defendant that his constitutional rights of due process and freedom from unreasonable searches and seizures should be no less when arrested or searched by a private security guard with police powers than when he is arrested or searched by a public police officer. The degree to which private security guards today supplement public police protection and the fact that they are permitted to carry deadly weapons and exercise broad powers of arrest, supports the argument that their conduct should be subject to the same limitations as public officers. There is ample authority for the proposition that the exclusionary rule does and should apply to evidence discovered as the result of an unreasonable search and seizure conducted by private security guards. We need not reach that question, however, as the search and seizure complained of in this case was not unreasonable.

241 N.W.2d at 250. But the Michigan Court of Appeals later distinguished this language as dicta and "specifically decline[d] to follow its result or reasoning." *People v. Holloway*, 267 N.W.2d 454, 456 (Mich. Ct. App. 1978). That court has since noted that "the relevant discussion in *Eastway* was rejected by *Holloway*." *People v. Lotta*, No. 214799, 2000 WL 33385383, at *2 n.2 (Mich. Ct. App. 2000). In any event, with respect to the Fourth Amendment question presented in this case, this Court is bound by the Sixth Circuit's controlling decisions in *Romanski* and *Lindsey*, not by any arguably contrary language in *Eastway*.

PageID.352–53.) But the Sixth Circuit has squarely held that a private security guard does *not* perform a public function where, as Talton highlights here, the guard merely exercises a power "possessed by ordinary citizens." *Lindsey v. Detroit Entm't, LLC*, 484 F.3d 824, 831 (6th Cir. 2007) (holding that a private security guard was not a state actor where plaintiff failed to "point to any powers above and beyond those possessed by ordinary citizens that the state of Michigan had delegated to Defendant's unlicensed security personnel at the time of Plaintiffs' arrests"); *see also United States v. Brooks*, No. 13-cr-00017, 2014 WL 413933, at *12 (M.D. Tenn. 2014) (holding that private security guards were not state actors, in part because "under Tennessee law, certain arrest powers, including the authority to arrest another person for committing a crime in that person's presence, are *not exclusively reserved* to public peace officers – and it is those nonexclusive police powers that private security guards may exercise" (emphasis in original)).

Smith and Perry's limited power to arrest for a felony committed in their presence – just like every other Michigan citizen – stands in sharp contrast to the type of plenary arrest powers that can elevate a private security guard to a state actor. The Sixth Circuit's decision in *Romanski* is instructive in this regard. In *Romanski*, a casino's private security police were licensed by the Michigan State Police as

"private security officers" under Mich. Comp. Laws § 338.1079.[8]  Under that statute, the holder of a "private security officer" license has "plenary arrest authority," including "the authority to arrest a person without a warrant as set forth for public peace officers." 428 F.3d at 638 (quoting Mich. Comp. Laws § 338.1080).  The Sixth Circuit held that the casino private security officers were state actors when they made an arrest because "the plenary arrest power enjoyed by private security police officers licensed pursuant to M.C.L. § 338.1079 is a power traditionally reserved to the state alone." *Id.*; *see also Durante v. Fairline Town Ctr.*, 201 F. App'x 338, 342 (6th Cir. 2006) ("Crucial to [the Sixth Circuit's] decision [in *Romanski*] was the fact that the officers were licensed under M.C.L. § 338.1079.").

Here, as noted above, Smith and Perry were not licensed as "private security officers" and thus did not enjoy plenary arrest powers under the statute that created that license.  Indeed, Smith and Perry did not hold any license at all.  And while Hi-Tech did hold a license, it was not one issued under the "private security officer" statute, and it did not imbue Hi-Tech or any of its employees with plenary arrest powers.  Thus, Smith and Perry did not hold (nor act under) a license that granted them the type of arrest powers that would have converted their otherwise private conduct into state action. *See Lindsey*, 484 F.3d at 831 ("Because Plaintiffs cannot

---

[8] The Michigan State Police administer the licensing of private security police. *See* Mich. Comp. Laws § 338.1079(1) ("The licensure of private security police . . . shall be administered by the department of state police.").

demonstrate that Defendant's security personnel were licensed [as private security officers] under Mich. Comp. Laws § 338.1079, they cannot show that Defendant engaged in action attributable to the state.").

## 2

Talton also has not proved that Hi-Tech's relationship with the Flint police satisfies the nexus test.

A party seeking to establish state action under the nexus test "must demonstrate that there is a sufficiently close nexus between the government and the private party's conduct so that the conduct may be fairly attributed to the state itself." *Chapman v. Higbee Co.*, 319 F.3d 825, 834 (6th Cir. 2003). "The nexus can be established with evidence of a customary or preexisting arrangement between the government and the private actor." *Durante*, 201 F. App'x at 344.

Talton has not shown that there was such a close nexus between Hi-Tech and the Flint Police Department that Smith and Perry's conduct may be fairly attributed to the government. He has not pointed to evidence of an "arrangement" between the two entities. And the evidence presented at the hearing did not suggest the existence of such an arrangement. Instead, the evidence showed that the Flint police would simply respond to Evergreen when Hi-Tech contacted them through the 911 emergency network – just as they respond when contacted in that manner by other Flint citizens and businesses.

Talton counters that "the Flint police are entwined in [the] management and control of Hi-Tech" because Johnson owns Hi-Tech and Hi-Tech contracts for its guards to provide "law enforcement services" at Evergreen. (Def.'s Supp. Br., ECF No. 22, PageID.354; quotations omitted.)  But there is no evidence that Johnson allowed his formal position as Chief of Police to bleed into his operation of Hi-Tech, nor is there any evidence that Johnson's work for Hi-Tech was in any way connected to his official role as Chief of Police.  Because Talton has not presented evidence "from which [the Court can] infer a customary or preexisting arrangement" between Hi-Tech and the Flint police, Smith and Perry's conduct is not "fairly attributed to the state itself." *Durante*, 201 F. App'x at 344.  Therefore, the Hi-Tech guards are not subject to the Fourth Amendment under the nexus test.

### III.  CONCLUSION

For all the reasons stated above, Talton has failed to establish that the Fourth Amendment applies to the stop and search by Smith and Perry.  Accordingly, the Court **DENIES** Talton's motion to suppress (ECF No. 9).

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  December 3, 2019

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on December 3, 2019, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764